**UNITED STATES of America,**
**Plaintiff–Appellee/Cross–**
**Appellant,**

v.

**Shari Lewis LANG, also known as Shari Lewis, also known as Shari King; Johnny Lang, also known as Melvin Pitchford,** **Defendants–Appellants/Cross–Appellees.**

Nos. 02–4075, 02–4091, 02–4103, 02–4128.

United States Court of Appeals,
Tenth Circuit.

April 21, 2004.

**1212**

Jill M. Wichlens, Assistant Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the briefs), Office of the Federal Public Defender for the District of Colorado, Denver, CO, for Defendant–Appellant/Cross–Appellee Shari Lewis Lang.

Stephen R. McCaughey, Salt Lake City, UT, for Defendant–Appellant/Cross–Appellee Johnny Lang.

Diana Hagen, Assistant United States Attorney (Paul M. Warner, United States Attorney, with her on the briefs), Office of the United States Attorney for the District of Utah, Salt Lake City, UT, for Plaintiff–Appellee/Cross–Appellant United States.

Before TACHA, Chief Circuit Judge, BRORBY, Senior Circuit Judge, and MURPHY, Circuit Judge.

TACHA, Chief Circuit Judge.

A jury convicted Defendant–Appellant Johnny Lang and Defendant–Appellant Shari Lewis Lang of the following: (1) obstructing justice under 18 U.S.C. § 1504, (2) acting as accessories after the fact to the distribution of heroin in violation of 18 U.S.C. § 3, and (3) conspiring to do both in violation of 18 U.S.C. § 371. The jury also convicted Mr. Lang of making a false statement to the FBI in violation of 18 U.S.C. § 1001 and found Mrs. Lang guilty of unlawfully removing a document from a federal clerk's office in violation of 18 U.S.C. § 2071(a).

After departing downward to offense levels of 21, the district court sentenced each of the Langs to a forty-six-month prison term. Both filed timely notices of appeal, and the government filed timely cross-appeals challenging the downward departures. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, REVERSE the downward departures, and AFFIRM the remainder of the district court's decision.

## I. Background

While working for the clerk of a federal district court in Utah, Mrs. Lang copied and took home a sealed affidavit. Once home, she read the document, which authorized police to use a tracking device in a narcotics investigation, and discussed its contents with Mr. Lang, her husband.

Following this conversation, Mr. Lang traveled to a payphone at a nearby grocery store. Although neither of the Langs knew the subjects of the drug investigation, Mr. Lang called one of the suspects, German Perez. Because he knew that officers had tapped Mr. Perez's phone, Mr. Lang requested that Mr. Perez call him back from another phone. Because he spoke little English and did not fully understand Mr. Lang, Mr. Perez had an associate return the call on the same phone,

thus permitting FBI agents to record both calls.

During the second call, Mr. Lang informed the associate that federal agents had bugged the cell phone and were preparing to place a tracking device on one of their cars. Mr. Lang stated that he had obtained this information from a friend in the federal courthouse and that he had seen documents proving these facts. Mr. Lang then returned to his home, his absence allegedly unnoticed by his wife.

The next day, an individual visited the home of Galen Ure, a man listed in the stolen affidavit as buying heroin from Mr. Perez. The individual gave Mr. Ure the affidavit, stating that he received it "from somebody that thought he might know the people involved." Although Mr. Ure's heroin use impaired his memory, his description of the individual closely matched Mr. Lang.

That afternoon, federal agents interviewed Mrs. Lang. After first denying that she stole the documents, Mrs. Lang admitted that she had taken a copy of the affidavit home and discussed it with her husband. On hearing her husband's voice on an FBI recording of his conversations with Mr. Perez, Mrs. Lang exclaimed "that's my husband." When then asked about her activities after discussing the affidavit with her husband, Mrs. Lang stated that she went to bed between 6:30 and 7:00 p.m. When the officers informed her that Mr. Lang called Mr. Perez between 6:15 and 6:30 p.m., she claimed instead to have gone to bed closer to 6:00 p.m.

At trial, a jury convicted Mrs. Lang on all charges. At sentencing, the district court set Mrs. Lang's offense level at 30, resulting in a guideline range of 97 to 121 months. The district court, however, departed downward to an offense level of 21 based on (1) Mrs. Lang's brief involvement as an accessory, which the district court

believed removed her from the heartland of accessory-after-the-fact cases, and (2) a belief that Mrs. Lang's theft was aberrant behavior given her education and employment history. The district court, ultimately, sentenced Mrs. Lang to a forty-six-month prison term, the maximum sentence for her offense level.

A jury also convicted Mr. Lang on all charges. At sentencing, the district court set Mr. Lang's offense level at 28, resulting in a guideline range of 78 to 97 months. After departing downward to an offense level of 21 based on Mr. Lang's allegedly brief involvement as an accessory, the district court sentenced him to a forty-six-month prison term, the maximum for his offense level. This appeal, and the government's cross-appeal, followed.

## II.  *Discussion*

We face several issues on appeal. First, the government on cross-appeal argues that the district court erred in departing downward based on (1) the Langs' limited participation in the conspiracy and (2) Mrs. Lang's allegedly aberrant behavior in committing the crimes in question. Next, the Langs both contend that the district judge erred in failing to recuse herself sua sponte pursuant to 28 U.S.C. § 455(a). In addition, Mrs. Lang urges that (1) the district court erroneously determined her base offense level under the United States Sentencing Guidelines ("the Guidelines"), and (2) it wrongfully convicted her under 18 U.S.C. § 2071. Finally, Mr. Lang (1) asserts that the district court mistakenly admitted evidence and (2) challenges the sufficiency of the evidence on his conspiracy charge. We address each issue in turn.

### A.  *United States' Cross–Appeal: Downward Departures*

#### 1.  *Standard of Review*

■ For most convictions, a sentencing court may depart from the sentence range

set by the Guidelines only if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b)(1). We review both upward and downward departures under the four-part standard set forth in *United States v. Jones,* 332 F.3d 1294, 1299–1300 (10th Cir.), *cert. denied,* —— U.S. ——, 124 S.Ct. 457, 157 L.Ed.2d 330 (2003).

Under *Jones,* we must first "ascertain whether the district court set forth, in a written order of judgment, its specific reasons for departure." *Id.* at 1299. Second, we must ensure that those reasons "advance the objectives set forth in section 3553(a)(2)," and do not violate "any specific prohibition in the Guidelines." *Id.* (citations omitted). We review this second prong de novo. *Id.* "Third, we must consider whether the factors the district court relied upon were authorized under section 3553(b) and justified by the facts of the case." *Id.* at 1299–1300 (internal quotations omitted). A factor is only "authorized" if it is "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." *Id.* at 1300 (citations omitted). We review this "application of the Guidelines to the facts" de novo, and review the district court's findings of fact for clear error. *Id.* at 1300 & n. 9. Finally, we must determine whether the sentence "departs to an unreasonable degree from the applicable guidelines range." *Id.* "In reviewing the degree of departure, we give due deference to the district court" and uphold its sentence absent an abuse of discretion. *Id.* (citations omitted).

Mrs. Lang argues that the standard of review set forth in *Jones* does not apply to her case because *Jones* only addressed upward departures.[1] We disagree. Title 18, section 3742(e) of the United States Code, the statutory subsection that mandates de novo review, does not distinguish between upward and downward departures, stating only that "[w]ith respect to determinations under subsection (3)(A) or (3)(B), the court of appeals shall review de novo the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e)(4). Further, subsections (3)(A) and (3)(B) apply to *all sentences* "outside the applicable guideline range." 18 U.S.C. § 3742(e)(3). This plain reading of the statutory language finds support in the decisions of other circuits. *See United States v. Stockton,* 349 F.3d 755, 764 (4th Cir.2003) (holding that 18 U.S.C. § 3742(e) applies to downward departures); *United States v. Mallon,* 345 F.3d 943, 945–47 (7th Cir.2003) (same). Therefore, based on the statute's plain text, we reject Mrs. Lang's argument and make explicit that 18 U.S.C. § 3742(e) mandates de novo review for both upward and downward departures.

### 2. *Limited Participation Departure*

■ The United States argues that we should reverse the Langs' downward departures because the district court departed based on unauthorized considerations. As noted above

[t]o determine whether the factors [employed by the district court] are authorized, we look to 18 U.S.C. § 3553(b)(1), which provides that a district court may depart if there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commis-

---

1. At oral argument, counsel for Mrs. Lang briefly argued that the PROTECT Act does not apply retroactively. For the reasons given by the Fifth Circuit in *United States v. Bell,* 351 F.3d 672, 674–75 (5th Cir.2003), we hold that it does.

sion in formulating the guidelines." *Jones*, 332 F.3d at 1300 (quotations omitted).

For factors already considered by the Guidelines, "departure from the applicable guideline range is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense." U.S.S.G. § 5k2.0; *see also United States v. Fagan*, 162 F.3d 1280, 1284 (10th Cir.1998).

The district court departed in this case based on the Langs' short involvement as accessories, reasoning that in such situations it would be "outside the heartland" to sentence the Langs based on "drug quantities from drug dealing that ha[d] gone on for an extended period of time." We disagree.

The Langs' limited participation as accessories does not warrant a downward departure because the Guidelines already account for an accessory's minimal participation. Section 2X3.1 of the Guidelines relies on the minimal participation inherent for all accessories in deducting six levels from the base offense level of the underlying offense. U.S.S.G. § 2X3.1(a)(1). Moreover, § 3B1.2 directs a sentencing court to decrease a defendant's offense level by 4 levels "[i]f the defendant was a minimal participant in any criminal activity" or by 2 levels "[i]f the defendant was a minor participant in any criminal activity...." U.S.S.G. § 3B1.2. The Guidelines note, however, that "[t]he adjustment from § 3B1.2 (Mitigating Role) normally would not apply [to an accessory] because an adjustment for reduced culpability is incorporated in the base offense level." U.S.S.G. § 2X3.1, Application Note 2. As these provisions make clear, the Guidelines already consider an accessory's limited participation. Therefore, the district court may depart downward on that basis only if the Langs' involvement as accessories was exceptionally short.

Compared to that in other accessory cases, the Langs' involvement, which ranged from a couple of hours to a day, was not exceptionally short. Individuals often act as accessories for a much shorter period. For instance, perjury "in respect to a criminal offense" falls under the Guidelines' structure for accessory, *see* U.S.S.G. § 2J1.3, and yet a perjurer often violates the law for only a matter of seconds, *see United States v. Renteria*, 138 F.3d 1328, 1330 31 & 1334 (10th Cir.1998). Likewise, disposing of a weapon used to commit a felony may take only minutes, and yet this crime falls within the heartland of the accessory guidelines. *See United States v. Martinez*, 342 F.3d 1203, 1205 (10th Cir.2003). Therefore, because the Lang's involvement was not exceptionally short, we find that the district court erred in departing downward on that basis. *See e.g. United States v. Jimenez*, 282 F.3d 597, 600–01 (8th Cir.2002).

### 3. *Aberrant Behavior Departure*

The district court also erred in departing downward on Mrs. Lang's sentence based on the allegedly aberrant nature of her criminal behavior. The district court specifically based its aberrant behavior departure on the fact that Mrs. Lang "has gone to school, she's graduated from high school, she's trained herself through college, [and] she's up until the recent period [had] a very good work ethic."

These factors do not justify an aberrant behavior departure. Application Note 1 to § 5k2.20 of the Guidelines states that an aberrant behavior departure is only permissible if the defendant's crime "(A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation ... from an otherwise law-abiding life." U.S.S.G. § 5k2.20, Application Note 1. Even if Mrs.

Lang satisfied points (A) and (B), she failed to meet the requirements of point (C). As the district court states, "there was a history and is a history of drug use [by Mrs. Lang]." Moreover, Mrs. Lang's Presentence Investigation Report contains additional information that counsels against a finding that her behavior here "represents a marked deviation ... from an otherwise law-abiding life." U.S.S.G. § 5k2.20, Application Note 1.

Furthermore, Mrs. Lang's education and work history, on which the district court based its aberrant behavior departure, are discouraged factors that a district court should only consider in cases where the surrounding circumstances render the educational and employment accomplishments extraordinary. U.S.S.G. § 5H1.2; *see also United States v. Alvarez–Pineda*, 258 F.3d 1230, 1240 (10th Cir.2001). Neither the district court nor Mrs. Lang have provided any persuasive evidence that her education or employment history are exceptional. Therefore, given the overwhelming evidence that Mrs. Lang's behavior was not aberrant, we find that the district court erred in granting Mrs. Lang an aberrant behavior departure.

### B. *Langs' Joint Issue: Recusal*

#### 1. *Standard of Review*

Both Langs argue on appeal that the district judge erred in failing to recuse herself based on alleged appearances of partiality. *See* 28 U.S.C. § 455(a). When a party does not timely file a motion to recuse under 28 U.S.C. § 455(a), as is true in this case,[2] our circuit is divided on the appropriate standard of review. In *United States v. Stenzel*, 49 F.3d 658, 661 (10th Cir.1995), the court held that "[b]ecause the defendant made no timely objection [pursuant to § 455(a)] the recusal issue was not preserved for appeal." According to *United States v. Kimball*, 73 F.3d 269, 273 (10th Cir.1995), however, when "[d]efense counsel neither file[s] a pleading nor move[s] for recusal during trial ..., we decide under a plain error standard whether the district judge ... reasonably appeared to be so biased that we should order retrial with a different judge."

While noting the conflicting standards raised by these two decisions,[3] we have neither the authority, *see United States v. Edward J.*, 224 F.3d 1216, 1220 (10th Cir. 2000) ("Under the doctrine of stare decisis, this panel cannot overturn the decision of another panel of this court barring en banc

---

**2.** To be timely, the Langs would have had to file a motion to recuse under 28 U.S.C. § 455(a) at trial because, as Mrs. Lang's trial counsel admits in an affidavit to the district court, they knew early in the trial of the evidence that allegedly required recusal. *Compare United States v. Kimball*, 73 F.3d 269, 273 (10th Cir.1995) (applying plain error review because the defendant knew at the pre-trial hearing of the facts underlying his § 455(a) appeal) *with United States v. Pearson*, 203 F.3d 1243, 1276 (10th Cir.2000) (finding a § 455(a) appeal timely raised, despite the failure to bring this issue before the district court, when facts underlying the appeal did not emerge until immediately before the district court pronounced sentence). Nevertheless, neither of the Langs filed a § 455(a) motion at trial.

**3.** Both Langs cite *United States v. Gigax*, 605 F.2d 507, 510 (10th Cir.1979), for the proposition that we review unraised § 455 complaints under an abuse of discretion standard. We decided *Gigax*, however, before the Supreme Court released *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). *Olano* directs us to review unraised errors under a four-step plain error standard. *See id.* at 731, 113 S.Ct. 1770. Accordingly, to the extent that *Gigax* reviewed unraised § 455 error for an abuse of discretion, following *Olano*, it is no longer good law. *See United States v. Hernandez–Rodriguez*, 352 F.3d 1325, 1333 (10th Cir.2003) (holding that an intervening Supreme Court case can overturn circuit precedent).

reconsideration, a superseding contrary Supreme Court decision, or authorization of all currently active judges on the court.") (internal quotations omitted), nor the need to resolve this dispute today because the Langs' § 455(a) appeals fail under either standard of review. By definition, the Langs lose if *Stenzel* controls because their § 455(a) appeal would be waived. For the reasons set forth below, their appeal also fails when reviewed for plain error under *Kimball.*

■ "To notice plain error under Fed. R.Crim.P. 52(b), the error must (1) be an actual error that was forfeited; (2) be plain or obvious; and (3) affect substantial rights, in other words, in most cases the error must be prejudicial, i.e., it must have affected the outcome." *United States v. Edgar,* 348 F.3d 867, 871 (10th Cir.2003). Even if these conditions are satisfied, we have discretion to reverse only if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

### 2. *Failure to Recuse Under Plain Error Review*

On appeal, the Langs argue that the district judge should have recused herself because: (1) prior to serving on the bench, she worked for the United States Attorney's Office in Utah, where she became friends with Mr. Walz, the prosecutor in these cases; (2) her husband worked as an Assistant United States Attorney ("AUSA") in the same office as Mr. Walz at the time of trial and sentencing; (3) she met with Mr. Walz's wife and mother-in-law in her chambers during a recess in the trial; and (4) Mrs. Lang stole the documents in question while working in the same courthouse as the district judge.

■ Title 28, section 455(a) of the United States Code provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Under this standard, "[t]he trial judge must recuse himself when there is the appearance of bias, regardless of whether there is actual bias." *Bryce v. Episcopal Church of Colo.,* 289 F.3d 648, 659 (10th Cir.2002). "The test is whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *Id.* (internal quotations omitted). As such, we consider the totality of the circumstances when reviewing such claims, disregarding "the judge's actual state of mind, purity of heart, incorruptibility, [and] lack of partiality." *Nichols v. Alley,* 71 F.3d 347, 351 (10th Cir.1995).

■ Considering this claim under plain error review, we need not reach the troubling issue of whether the district judge erred in refusing to recuse herself, nor whether the judge's decision affected the Langs' substantial rights, because the error here—if any exists—does not satisfy the final prong of plain error review. *See United States v. Cotton,* 535 U.S. 625, 632, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) ("[W]e need not resolve [this issue], because even assuming respondents' substantial rights were affected, the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings.").

We admit that this conclusion seems counter-intuitive given the purpose and plain language of 28 U.S.C. § 455(a). On its face, it appears that a judge's failure to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned[,]" 28 U.S.C. § 455(a), would "seriously affect[ ] the fairness, integrity, or public reputation of judicial proceedings[,]" *Olano,* 507 U.S. at 736, 113 S.Ct. 1770 (internal quotations omitted). In fact, using language similar to that contained in *Olano,* legislative history of 28

U.S.C. § 455(a) states that Congress drafted it to "promote public confidence in the impartiality of the judicial process." *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 871, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) (Rehnquist, C.J., dissenting) (citing H.R.Rep. No. 93–1453, at 4 (1974), *reprinted in* 1971 U.S.C.C.A.N. 6351, 6355).

Nonetheless, our holding follows the Supreme Court's recent jurisprudence interpreting the fourth prong of *Olano,* which strictly defines when courts can find this prong satisfied. In *Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), the district judge erroneously concluded that he, rather than the jury, should determine the materiality of Mr. Johnson's allegedly false statements. Neither party objected at trial. On appeal, the *Johnson* Court found that the district court's failure to give the issue of materiality to the jury violated the Fifth and Sixth Amendments to the Constitution. *Id.* at 468, 117 S.Ct. 1544. Nevertheless, the Court held that the error did not "seriously affect[ ] the fairness, integrity or public reputation of the judicial proceedings" because of the overwhelming and essentially uncontroverted record evidence of materiality. *Id.* at 469–70, 117 S.Ct. 1544 ("On this record there is no basis for concluding that the error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings. Indeed, it would be the reversal of a conviction such as this which would have that effect.").

In *Cotton,* the district court enhanced Mr. Cotton's sentence based on the amount of drugs sold, even though the indictment did not mention drug quantity. *Cotton,* 535 U.S. at 628, 122 S.Ct. 1781. The government conceded that the indictment's failure to allege the quantity of drugs sold by Mr. Cotton violated the Fifth Amendment. *Id.* at 632, 122 S.Ct.

1781. Nevertheless, the *Cotton* Court held that this error did not satisfy the fourth prong of *Olano* because the "overwhelming" and "essentially uncontroverted" record evidence supported the drug quantity finding. *Id.* at 633, 122 S.Ct. 1781. While agreeing "that the Fifth Amendment grand jury right serves a vital function" in our judicial system, the Court found this "no less true of the Sixth Amendment right to a petit jury, which ... did not, however, prevent us in *Johnson* from applying the longstanding rule that a constitutional right may be forfeited in criminal ... cases by the failure to make timely assertion of the right...." *Id.* at 634, 122 S.Ct. 1781. As in *Johnson,* the *Cotton* Court found that the harmful effect of reversing a sentence supported by overwhelming and essentially uncontroverted evidence superceded any impact on "the fairness, integrity or public reputation of judicial proceedings" from the district court's Fifth Amendment violation. *Id.*

In light of *Johnson* and *Cotton,* we find that the purported error here does not satisfy *Olano* 's fourth prong. In *Johnson* and *Cotton,* the Supreme Court found that violations of the Fifth and Sixth Amendments did not overcome the "threat ... to the fairness, integrity, and public reputation of judicial proceedings" that would result from reversing convictions supported by overwhelming and essentially uncontroverted evidence. *Id.* (internal citations omitted). Any error in this case derives not from a constitutional violation, but from a statutory transgression. *See Federal Trade Comm'n v. Cement Inst.,* 333 U.S. 683, 702, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) ("[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level."); *Walberg v. Israel,* 766 F.2d 1071, 1076–77 (7th Cir.1985) (recognizing that statutes mandating recusal for actual bias have constitutional bases, unlike those that require recusal for "a mere appearance of bias or prejudice").

In light of *Johnson* and *Cotton*'s refusal to find that constitutional violations satisfy this test, we hold that statutory errors, such as the one alleged here, do not satisfy the final prong of *Olano* when there is overwhelming and essentially uncontroverted evidence of defendant's guilt.

Because such evidence of the Langs' guilt exists here, we deny their § 455 appeal. As stated above, the Langs were convicted of five different offenses. The government presented overwhelming evidence at trial to support these charges. Given this evidence and the paucity of contrary testimony in the record, we find that the government provided overwhelming and essentially uncontroverted evidence of the Langs' guilt on all charges.[4] Accordingly, we find that the district judge did not commit plain error in failing to recuse herself under 28 U.S.C. § 455(a).

### C. *Mrs. Lang's Individual Appeals*

#### 1. *Sentencing Guideline Base Offense Level Calculation*

██ Mrs. Lang first argues that the district court erred in considering the entire quantity of drugs distributed by the Perez Organization when calculating her sentence. Relying on U.S.S.G. § 1B1.3, Application Note 10, she claims that the district court should only have considered the quantity of drugs that she knew, or reasonably should have known, the Perez Organization distributed. Under this interpretation, the amount of drugs distributed by the Perez Organization has no bearing on Mrs. Lang's sentencing unless the district court finds that she knew, or reasonably should have known, of the enormity of their operation.

Based on its reading of U.S.S.G. § 2X3.1(a), Application Note 1, the district court disagreed. It interpreted the Guidelines to require a reasonable-knowledge finding only for specific offense characteristics of the underlying offense. Thus, because the scope of the Perez Organization's distribution impacts the base offense level, rather than the specific offense characteristics, of the underlying narcotics trafficking offense, the district court did not look to Mrs. Lang's reasonable knowledge of the scope of the distribution network. We review the district court's interpretation of the Sentencing Guidelines de novo. *United States v. Plotts*, 347 F.3d 873, 876 (10th Cir.2003). This is an issue of first impression for our court.

The resolution of this issue rests on the interplay between § 2X3.1 and § 1B1.3 of the Guidelines. Section 2X3.1 states that the base offense level for an accessory after the fact conviction is "6 levels lower than the offense level for the underlying offense." U.S.S.G. § 2X3.1(a). Application Note 1 to that section defines "underlying offense" as "the offense as to which the defendant is convicted of being an

---

4. Specifically, the government introduced evidence that (1) Mrs. Lang stole a copy of a sealed affidavit; (2) she took this document home where she discussed it with her husband; (3) Mr. Lang left immediately thereafter to a payphone where he contacted German Perez, a suspect listed on the affidavit, and warned his associate about his bugged phone and the tracking device placed on a car used in his operation; (4) the next day, Mr. Lang visited the home of Galen Ure, another suspect listed on the affidavit, and, after discussing its contents, gave a copy of the affidavit to him; (5) Mrs. Lang admitted that the voice on the recording of the telephone call to Mr. Perez was that of Mr. Lang; (6) Mr. Lang lied to the FBI about his use of the pseudonym "Melvin" and about his phone call to Mr. Perez; and (7) Mrs. Lang lied to FBI agents about her activities on the night in question and about stealing a copy of the affidavit. Although the Langs' claim that they did not conspire to obstruct justice or to act as accessories and Mr. Lang claims that he did not meet with Mr. Ure, the Langs offer little evidence to substantiate these claims or to attack the weight of government evidence against them.

accessory." *Id.,* Application Note 1. It further directs the sentencing court to "[a]pply the base offense level plus any applicable specific offense characteristics that were known, or reasonably should have been known by the defendant." *Id.* Thus, § 2X3.1, applied in isolation, would only extend the reasonable-knowledge requirement to "specific offense characteristics" of the underlying offense.

Application Note 1 to § 2X3.1, however, casts doubt on this conclusion by directing courts to "*see* Application Note 10 of the Commentary to § 1B1.3." *Id.* Application Note 10 states that for "solicitation, misprision, or accessory after the fact, the conduct for which the defendant is accountable includes all conduct relevant to determining the offense level for the underlying offense that was known, or reasonably should have been known, by the defendant." U.S.S.G. § 1B1.3, Application Note 10. Therefore, reading Application Note 10 in isolation would extend the reasonable-knowledge requirement to all conduct used to determine the sentence for the underlying offense, not only specific offense characteristics.

Other circuits are split on how to resolve this apparent contradiction. Supporting Mrs. Lang's position, the Fifth and Sixth Circuits allow a sentencing court to consider only those drug quantities of which the defendant knew or should have known. *See United States v. Warters,* 885 F.2d 1266 (5th Cir.1989) (holding that a defendant can only be sentenced for misprision of felony based on drug quantities "*that* [he] knew, or should have known (or foreseen) ... w[ere] involved in the conspiracy"); *United States v. Shabazz,* 263 F.3d 603 (6th Cir.2001) (holding that U.S.S.G. § "1B1.3 [application note 10], brought in by the cross-reference in section 2X3.1, extends the [reasonable] knowledge requirement to 'all conduct relevant to determining the offense level for the underlying

offense' "); *but see United States v. Cihak,* 137 F.3d 252, 264 (5th Cir.1998) (finding in dicta that, contrary to existing circuit precedent, the " 'reasonable foreseeability' [requirement] applies only to the 'specific offense characteristic' "); *United States v. Stephens,* 906 F.2d 251, 253 (6th Cir.1990) (rejecting the reasonable-knowledge requirement without analysis). In reaching this conclusion, these circuits find the broad instruction in Note 10 to § 1B1.3 to be controlling. *Shabazz,* 263 F.3d at 608. They note that the alternate interpretation would read § 2X3.1's "cross-reference to the commentary to section 1B1.3 out of the guideline[s].... If [the contrary] view were correct, it is difficult to see why Application Note 1 to section 2X3.1 cross-references section 1B1.3." *Id.* at 608. Adopting the reasonable-knowledge requirement of § 1B1.3, these courts argue, "results in consistent treatment for adjustments for role in the offense, specific offense characteristics, and other sentencing factors and avoids creating one rule for a defendant's knowledge of specific offense characteristics and another for other underlying adjustments." *Id.* at 609.

While noting the valid concerns expressed by the Fifth and Sixth Circuits and the difficulty of this issue, we find the approach adopted in *United States v. Girardi,* 62 F.3d 943 (7th Cir.1995), more persuasive and hold that the reasonable-knowledge requirement in cases under § 2X3.1 applies only to specific offense characteristics of the underlying offense. Pursuant to the clear language of Application Note 1, the *Girardi* court found that the reasonable knowledge requirement applies only to specific offense characteristics, not the base offense level, of the underlying offense. *Id.* at 946 ("Neither Application Note 1 nor § 2X3.1 require that an accessory 'know' or 'reasonably know' of the factors used to calculate the base offense level, such as the quantity of drugs involved in the offense.") *Id.* at 946.

In settling on this interpretation, the *Girardi* court also highlighted that Application Note 10 to § 1B1.3 does not limit the accessory's accountability, but merely provides that it *"includes* conduct 'known' or that 'reasonably should have been known' by the accessory." *Id.* Since, according to the Guidelines, "[t]he term 'includes' is not exhaustive . . . ." U.S.S.G. § 1B1.1, comment (n. 2), Application Note 1 of § 2X3.1, does not contradict Application Note 10. Instead, it sets forth another type of relevant conduct—that not reasonably foreseeable to the accessory—used to calculate an accessory's base offense level.

■ For these reasons, we find that the interpretation presented by the *Girardi* court best resolves the prima facie tension between § 1B1.3 and § 2X3.1. Therefore, because drug quantity is not a specific offense characteristic of unlawfully trafficking heroin, U.S.S.G. § 2D1.1(a)(3), we affirm the district court's sentencing decision on this point.[5]

### 2. *Violation of 18 U.S.C. § 2071*

■ Mrs. Lang next alleges that the district court wrongfully convicted her of violating 18 U.S.C. § 2071 because the sealed record that she stole from the clerk's office was a copy, not the original affidavit. We find this argument without merit based on the text of the statute.

We reach this conclusion after determining that a copy of an officially filed document falls within the statutory language of a "record, proceeding, map, book, paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States." 18 U.S.C. § 2071. Although it is true that at times Congress has explicitly addressed document copies when it intends to include them in a statute, *see* 18 U.S.C. § 793(b) ("Whoever, for the purpose aforesaid, . . . copies, takes, makes, or obtains . . . any . . . [item] of anything connected with the national defense."), this is not always the case. Indeed, courts have interpreted statutes with similar language to § 2071 to cover copies despite the omission of the word "copies" from the statute. *See, e.g., United States v. DiGilio,* 538 F.2d 972 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1976) (finding that, under 18 U.S.C. § 641, which omits the word copies, "when an employee copies a record on government equipment without authorization, the duplicate copy is a record for purposes of the statute").[6] We, therefore,

---

**5.** Despite the difficult task of interpreting these competing Guideline provisions, the rule of lenity does not persuade us to adopt the reading of the Guidelines favored by Mrs. Lang. "Lenity applies only when the equipoise of competing reasons cannot otherwise be resolved. . . ." *Johnson v. United States,* 529 U.S. 694, 713 n. 13, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000). *See also United States v. Wilson,* 10 F.3d 734, 736 (10th Cir.1993) ("The rule's application is limited to cases where, after reviewing all available relevant materials, the court is still left with an ambiguous statute."); *Federal Statutes and Regulations,* 117 HARV. L.REV. 459, 468 (2003) ("[T]here is noteworthy consensus on the Court that the rule of lenity should always be subordinated . . . that is, [used] only to resolve

cases of equivocal ambiguity."). Having carefully considered both interpretations and concluded that the language of the Guidelines best supports the approach taken by the Seventh Circuit in *Girardi,* we are not faced with a case of equivocal ambiguity and need not apply the rule of lenity.

**6.** Although the *DiGilio* court reached this result pursuant to 18 U.S.C. § 641, rather than § 2701, we find it persuasive that both statutes employ strikingly similar language. *Compare* 18 U.S.C. § 2071(a) (prohibiting the "tak[ing] or carry[ing] away [of] any record . . ., paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States") *with* 18 U.S.C. § 641 (prohibiting "convert[ing] to his use or

find that a copy of a government record itself functions as a record for purposes of § 2071.

Moreover, to the extent Mrs. Lang argues that the copy was not itself "filed or deposited" as § 2071 requires, we disagree. Mrs. Lang admits in her brief that she stole a copy of the original *filed* affidavit from the clerk's office. She also admits that the government agents deposited the affidavit in the intake box of the clerk's office prior to her copying of the document. Because the copy of a government record is itself a government record, so the copy of a *filed* and *deposited* government record is itself a *filed* and *deposited* government record.[7] Because we find that (1) the copy of the affidavit itself is considered a government record, and (2) the affidavit had been filed and deposited in the clerk's office, Mrs. Lang's theft of the affidavit copy violates § 2071.

### D. *Mr. Lang's Individual Appeals*

#### 1. *Admission of Mr. Ure's Testimony*

Mr. Lang argues that the district court erroneously admitted Galen Ure's testimony. We review evidentiary rulings under an abuse of discretion standard and reverse district court rulings only for "a clearly erroneous finding of fact or an erroneous conclusion of law or ... a clear error in judgment." *United States v. Jenkins*, 313 F.3d 549, 559 (10th Cir.2002).

We find Mr. Lang's argument without merit. The district court admitted Mr. Ure's testimony as non-hearsay under Fed R. Evid. 801(d)(2)(E). We do not determine the applicability of Fed R. Evid.

801(d)(2)(E), however, because Fed R. Evid. 801(d)(2)(A) permits Mr. Ure's testimony regarding Mr. Lang's statements as a non-hearsay admission by party-opponent. *See In re Slack–Horner Foundries Co.*, 971 F.2d 577, 579–80 (10th Cir.1992) (holding we may affirm on any grounds supported by the record, even those not relied upon by the district court).

■ "A statement is not hearsay if .... [t]he statement is offered against a party and is ... the party's own statement, in either an individual or a representative capacity...." Fed.R.Evid. 801(d)(2)(A). Under this rule, the government need only prove by a preponderance of the evidence that Mr. Lang made the statements in question to Mr. Ure. *See United States v. Harrison*, 296 F.3d 994, 1001 (10th Cir.2002) ("The Court determines ... [Rule 801(d)(2) ] under a preponderance-of-the-evidence standard"). Though *Harrison* pertains to Fed.R.Evid. 801(d)(2)(B), we find no law, and Mr. Lang presents none, stating that we apply any different standard to statements under Fed.R.Evid. 801(d)(2)(A). *See id.* (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), for the proposition that the preponderance-of-the-evidence standard applies to Fed.R.Evid. 801(d)(2)(B) even though *Bourjaily* addresses Fed.R.Evid. 801(d)(2)(E)).

■ The government satisfied this standard by presenting evidence that Mr. Lang both spoke with Mr. Ure regarding the FBI investigation and gave him a copy of the stolen affidavit. While Mr. Ure

---

the use of another ... any record ... or thing of value of the United States"). Furthermore, neither statute discusses copies of government documents or defines the term 'record' in this context. Accordingly, a finding that copies of government records are themselves records under 18 U.S.C. § 641 applies equally under 18 U.S.C. § 2071(a).

7. Noting the move by courts and other government agencies to electronic filing, *see, e.g.,* David Harper, *Federal Courts to Start Taking Filings Over Internet*, Tulsa World, Aug. 31, 2003, at A21, any distinction that now remains between the filed status of originals and copies is likely to diminish further.

could not identify Mr. Lang definitively in court as the person with whom he spoke about the affidavit, all other evidence indicated that the individual in question was Mr. Lang.

First, Mr. Ure's physical description of the man with whom he spoke greatly resembled Mr. Lang. Second, the substance of the alleged conversation strongly suggests that the speaker was Mr. Lang. The individual spoke of having a conversation with German Perez about the affidavit on the previous day, the same day that Mr. Lang admits to having discussed the affidavit with Mr. Perez. Also, the individual spoke of receiving the affidavit from a "friend ... that works down at the federal courthouse." Mr. Lang's wife worked in the federal courthouse and took the affidavit. Third, the individual gave Mr. Ure a copy of the affidavit. It is uncontroverted that Mr. Lang had access to the affidavit and to a copy machine. This evidence indicates by a preponderance of the evidence that Mr. Lang spoke to Mr. Ure. Mr. Ure's testimony was, therefore, admissible as a non-hearsay admission by party-opponent.

### 2. Sufficiency of the Evidence—Conspiracy to Act as an Accessory

Next, Mr. Lang claims that insufficient evidence exists to convict him of conspiring with Mrs. Lang to act as an accessory after the fact to the drug trafficking operation. "We review the sufficiency of evidence in a light most favorable to the government to determine if there was sufficient evidence upon which a reasonable jury could find the existence of a conspiracy beyond a reasonable doubt." *United States v. Ailsworth,* 138 F.3d 843, 850 (10th Cir.1998). "To obtain a conviction for conspiracy, the government must prove that (1) there was an agreement to violate the law; (2) Defendant knew the essential objectives of the conspiracy; (3) Defendant knowingly and voluntarily took part in the

conspiracy; and (4) the coconspirators were interdependent." *Id.* "In determining the sufficiency of the evidence, we review the record de novo." *United States v. Urena,* 27 F.3d 1487, 1489 (10th Cir. 1994), *cert. denied,* 513 U.S. 977, 115 S.Ct. 455, 130 L.Ed.2d 364 (1994).

Of the four elements of conspiracy, Mr. Lang claims only that insufficient evidence exists to support the first requirement, the existence of "an agreement to violate the law." *Ailsworth,* 138 F.3d at 850. To prove an agreement, "[t]he government need not offer direct proof of an express agreement on the part of the defendant. Instead the agreement may be informal and may be inferred entirely from circumstantial evidence." *United States v. Whitney,* 229 F.3d 1296, 1301 (10th Cir.2000) (citations omitted). Indeed, "the defendant's participation in, or connection to, the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." *Id.* Acceptable circumstantial evidence of agreement could include: "a common motive, presence in a situation where one could assume participants would not allow bystanders, repeated acts, mutual knowledge with joint action, and the giving out of misinformation to cover up [the illegal activity]." *Id.* (quotations omitted).

■ The record evidence supports the conspiracy conviction. First, Mr. Ure testified that a person closely resembling Mr. Lang visited his house the day after Mrs. Lang removed the sealed documents from the clerk's office. According to Mr. Ure, the individual told Mr. Ure that he "had this paper, and that he had gotten it from somebody that thought that he [the individual] might know the people that was [sic] involved that was in the paper." Furthermore, Mr. Lang admitted in his tapped cell-phone conversations that he had "a friend ... that works down at the federal courthouse, and paperwork came through

on you." Further, after Mrs. Lang returned from work with the affidavit, Mr. Lang admits that he and his wife discussed the affidavit and the people mentioned in it before he left the house.

The Langs misrepresentations to the FBI further support a finding of sufficient evidence to prove the conspiracy conviction. *Id.* When first approached by FBI agents, Mrs. Lang stated that she went to bed between 6:30 and 7:00 p.m. on the day she stole the affidavit. After learning from the agents that Mr. Lang called the suspects at approximately 6:15 p.m., however, she abruptly changed her story, stating instead that she went to bed at 6:00 p.m. Moreover, Mrs. Lang initially told FBI agents that she had shredded the extra copy of the affidavit, only to admit later that she had taken it home out of "curiosity." In addition, Mr. Lang lied to FBI agents by denying that he called German Perez on the night that Mrs. Lang came home with the affidavit.

After reviewing the record, we have little difficulty concluding that sufficient evidence exists to allow a reasonable jury to find, beyond a reasonable doubt, that a conspiracy existed between the Langs to act as accessories to a drug trafficking operation.

### III. *Conclusion*

Based on the foregoing, we REVERSE the district court's downward departures for both Langs, remanding both cases for resentencing pursuant to 18 U.S.C. § 3742(f)(2)(B), and AFFIRM the decision of the district court on the remaining issues.

MURPHY, Circuit Judge, concurring in part and dissenting in part.

### I. INTRODUCTION

I join all portions of the majority opinion, with the exception of sections II.C.1 (addressing the calculation of Shari Lang's base offense) and II.C.2 (addressing Lang's conviction for violating 18 U.S.C. § 2071(a)). As to those two specific sections of the majority opinion, I respectfully dissent.

With regard to Lang's § 2071(a) conviction, the majority concludes that her removal of a photocopy of a sealed affidavit from the district court clerk's office constitutes a violation of § 2071(a). *See* Majority Op. at 1221–22. Lang's conduct, however, does not fall within the parameters of § 2071(a). The plain language of § 2071(a), verified within its historical context, demonstrates that it was intended to criminalize the obliteration, destruction, or theft of documents from the public record, rather than the disclosure of the information contained in those documents.

As to the calculation of Lang's base offense level, the majority concludes that the district court properly considered all drug quantities distributed by the Perez Organization in arriving at Lang's base offense level, without regard to whether those quantities were reasonably foreseeable to Lang. *See* Majority Op. at 1219–21. The approach adopted by the majority is inconsistent with the weight of precedent, creates a system where accessories can be punished much more harshly than the principal whom they aided, and renders U.S.S.G. § 1B1.3 application note 10 superfluous. At a minimum, the relevant Guideline provisions are so contradictory and ambiguous, that the rule of lenity should apply.

### II. DISCUSSION

#### A. *Lang's 18 U.S.C. § 2071(a) Conviction*

This case presents the following narrow question: Does the removal of a photocopy of a document filed with the Clerk of the United States District Court for the Dis-

trict of Utah constitute a violation of 18 U.S.C. § 2071. In answering that question in the affirmative, the majority relies on the decision in *United States v. DiGilio*, 538 F.2d 972, 976–78 (3d Cir.1976), to conclude that the copy of the affidavit made by Lang is itself a governmental record. Majority Op. at 1221–22. The majority further concludes that because the original affidavit was filed with the clerk's office the copy must also necessarily have been filed. *Id.* at 1222. Based on these two subsidiary conclusions, the majority holds that "Mrs. Lang's *theft* of the affidavit copy violates § 2071." Majority Op. at 1222 (emphasis added).

The problem with the majority's analysis, and its reliance on *DiGilio*, is that Lang was not indicted for violating 18 U.S.C. § 641, the provision of the United States Code which criminalizes the *theft* of government records. Instead, she was indicted for violating 18 U.S.C. § 2071. Section 2071 and § 641 were designed to deal with entirely different evils.

1. Section 2071 provides as follows:
   (a) Whoever willfully and unlawfully conceals, removes, mutilates, obliterates, or destroys, or attempts to do so, or, with intent to do so takes and carries away any record, proceeding, map, book, paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States, or in any public office, or with any judicial or public officer of the United States, shall be fined under this title or imprisoned not more than three years, or both.
   (b) Whoever, having the custody of any such record, proceeding, map, book, document, paper, or other thing, willfully and unlawfully conceals, removes, mutilates, obliterates, falsifies, or destroys the same, shall be fined under this title or imprisoned not more than three years, or both; and shall forfeit his office and be disqualified from holding any office under the United States. As used in this Subsection, the term "office" does not include the office held by any person as a retired officer of the Armed Forces of the United States.

Section 2071[1] is one of six provisions set out in chapter 101 of title 18. Each of the six provisions in chapter 101 relates to either (1) the concealment, removal, mutilation, or falsification of government records or reports, or (2) the failure by government officials to file reports as required by law. *See* 18 U.S.C. §§ 2071 to 2076. It is clear from the plain language of § 2071, and its placement in chapter 101 with other provisions relating to the accuracy of the record of government affairs, that § 2071 was designed for the narrow purpose of criminalizing the obliteration of information from the record of public affairs. In contrast, the theft of government records is prohibited by § 641,[2] which is set out in chapter 31 of title 18. Chapter 31 prohibits numerous kinds of thefts and embezzlements, including both public and nonpublic monies, documents, and records. In concluding that Lang's conduct violates § 2071, the majority has ignored key distinctions in the operative spheres of §§ 641 and 2071.

2. Section 641 provides as follows:
   Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
   Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—
   Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.
   The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

In *United States v. Rosner*, 352 F.Supp. 915 (S.D.N.Y.1972) the court was faced with a set of facts remarkably similar to the facts of this case. The defendant in *Rosner* was accused of copying grand jury materials and providing the copies to an investigator posing as a corrupt police officer. *Id.* at 917. After he was indicted on charges of violating § 2071(a), the defendant moved to dismiss the indictment on the ground that § 2071(a) did not criminalize the mere photocopying of government records, even sensitive records like grand jury transcripts. *Id.* at 919.

The *Rosner* court began by undertaking an extensive historical analysis of § 2071 and its predecessors. *Id.* at 919–21. That analysis, coupled with the restrictive language of the statute, led the *Rosner* court to conclude that § 2071 was directed to a particularly narrow evil: obliteration from the public record of official documents of the United States. *Id.* at 919–20. Because the photocopying of the grand jury documents had not obliterated the documents from the public record, the *Rosner* court concluded that the indictment did not set out a violation of § 2071. *Id.* at 921–22. According to the court in *Rosner*

> [The] purpose [of § 2071] is to prevent any conduct which deprives the Government of the use of its documents, be it by concealment, destruction, or removal.... Despite its antiquity, legislative history is almost wholly lacking. It has been, however, the subject of careful analysis by a District Judge for the Eastern District of Michigan.... In speaking of Section 2071(a)'s predecessor[,] ... that Court said:
>
> > [ ]It is manifest that this statute is not broad enough, and was not intended to punish the mere larceny or theft of the papers or documents as property, but that the essential element of the offense is the specific intent to destroy them as records of a public office; or, in other words, to obliterate or con-

ceal them as evidence of that which constitutes their value as public records, or to destroy or impair their legal effect or usefulness as a record of our governmental affairs, be that effect or usefulness what it may.[ ] *United States v. DeGroat*, 30 F. 764 (E.D.Mich.1887).

The First Circuit later came to a similar conclusion, holding that its purpose was "to preserve [papers, documents, and files] as evidence relating to things which concern the public and the government." *McInerney v. United States*, 143 F. 729 (1st Cir.1906).

One Court has considered the applicability of this statute in a strikingly similar situation. In *Martin v. United States*, 168 F. 198 (8th Cir.1909), the defendant was indicted under ... the antecedent of § 2071(b). He was accused of having withdrawn from the office of the commissioner for certain Indian tribes a roll containing names of Indians, copying the roll during evenings and weekends, and then returning it to the office. Such conduct was held not to violate that section. The Court reasoned that ... the statute was not intended to make criminal a removal "which in no way interferes with the lawful use of the record or document in its proper place." The indictment was quashed.

Each of these Courts recognized, moreover, that the predecessors of Section 2071 were not larceny statutes. The District Court in *DeGroat* contrasted the statute with ... the predecessor of 18 U.S.C. § 641, the specific purpose of which, the Court noted, was to prevent larceny. This distinction was reinforced by the decision of the draftsmen of the 1948 revision of Title 18 to eliminate the phrase "with intent to steal" from Section 2071 because theft was thought to be covered by Section 641....

Section 2071 has not been used to prosecute larceny. It has instead been customarily employed where Government records have been mutilated or destroyed. *See, e.g., Kaphan v. United States*, 264 F. 323 (9th Cir.1920); *Davidson v. United States*, 292 F. 750 (3rd Cir.1923); *Husar v. United States*, 26 F.2d 847 (9th Cir.1928). In recent years, the records involved have frequently been Selective Service System files. *See, e.g., United States v. Cullen*, 305 F.Supp. 695 (E.D.Wis.1969); *United States v. Eberhardt*, 417 F.2d 1009 (4th Cir.1969); *United States v. Moylan*, 417 F.2d 1002 (4th Cir.1969), *cert. denied* 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970); *United States v. Chase*, 309 F.Supp. 430 (N.D.Ill.1970), *mandamus granted* 435 F.2d 1059 (7th Cir.1970). It has also been used to prosecute the removal of Government records. *See United States v. Coplon*, 88 F.Supp. 910 (S.D.N.Y.1949); *Coplon v. United States*, 89 U.S.App.D.C. 103, 191 F.2d 749 (1951), *cert. denied* 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 960 (1951). The essence of the offense charged in such prosecutions has not been larceny, for which Section 641 was available, but the rendering of information unavailable to the Government.

*Rosner*, 352 F.Supp. at 919–21 (footnote omitted).

The *Rosner* court's thorough and well-supported analysis is persuasive. Its decision that § 2071 is violated only by the obliteration of information from the record of government affairs is fully supported by the plain language of § 2071 and the placement of § 2071 in chapter 101 with other provisions relating to the accuracy of the record of governmental affairs. Finally, it must be further noted that neither the government nor the majority has cited a single case from the long history of the statute in which § 2071 has successfully been used to prosecute the photocopying of government documents. In fact, *DiGilio*, the only case relied on by the majority, dealt with the prosecution *under § 641* of an individual who made photocopies of FBI records and provided the records to the subject of the FBI investigation. 538 F.2d at 975. The effect of the majority's ruling is a blurring of the lines between § 2071 and § 641 and the partial or full redundancy of either one or both of those provisions.

Perhaps recognizing the force of the analysis set out in *Rosner*, the government itself has declined to advocate the very rule adopted by the majority in this case. While the majority has ruled that the removal of a photocopy of a document filed with the clerk of a federal court is always a violation of § 2071, Majority Op. at 1221–22, the government asserts that the removal of a photocopy of a filed document should only amount to a violation of § 2071 when the stolen document's secrecy, not the information contained within the document, represents its entire value to the government.[3] That is, the government ar-

---

**3.** The government argues as follows in its brief:

The [*Rosner*] court rejected the government's argument and held that Section 2071 was limited to those cases where removal of the document renders the information unavailable to the government. Therefore, under the *Rosner* court's analysis, a violation of Section 2071 would occur only where the original and all copies of the document are removed from the government's file so that the government no longer has access to the information.

The *Rosner* decision fails to account for the varying purposes of different types of government documents. In most situations, the *Rosner* court would be correct that the removal of a photocopy would not destroy the usefulness of the original document. Because the value of most government documents lies in the information contained therein, the government would

gues that Lang's removal of a photocopy of the affidavit and release of its contents constituted a constructive destruction of the affidavit, thereby bringing her actions within the ambit of § 2071.

This contention was also considered and rejected by the court in *Rosner.* According to *Rosner,*

> [The court is] compelled to conclude that Section 2071 does not embrace any and all instances of removal of Government record; it proscribes that removal which deprives the Government of the use of the records. That is not the type of removal involved here. There is no allegation that the documents themselves were tampered with, or that the Government was deprived of their use. At most, the Government argues for what might be termed "constructive destruction"; that is, although the documents were not physically destroyed, their utility in the Government's pending prosecutions was destroyed because of their premature disclosure. Such an argument may have some superficial appeal, but I am reluctant to broaden the reach of a criminal statute through such an unprecedented construction. It is axiomatic that criminal statutes must be narrowly construed, and further, it would seem, broadening Section 2071 by including the concept of "constructive destruction" could easily render the statute itself dangerously vague.

> In its brief the Government relies heavily, if not exclusively, on [*United States v. Bottone,* 365 F.2d 389 (2d Cir. 1966).] There, the Second Circuit con-

sidered the applicability of 18 U.S.C. § 2314, involving the interstate transportation of stolen property, to the photocopying of documents. The Court held that even though photocopying was the only criminal activity alleged, an offense was nevertheless made out because "[w]hen the physical form of the stolen goods is secondary in every respect to the matter recorded in them, the transformation of the information in the stolen papers into a tangible object never possessed by the original owner should be deemed immaterial." The Government in citing *Bottone* appears to ignore that the core of the offense charged in 18 U.S.C. § 2314, as the above quotation indicates, is larceny. It is obvious that frequently the transmission of the information contained in documents is just as larcenous as theft of the documents themselves. Hence, had the defendants in the instant case been indicted under 18 U.S.C. § 641, the reasoning of *Bottone* would be fully applicable. But, as I have already pointed out, this indictment alleges no such crime. Section 2071 is not concerned with the transmission of information, as Section 641 arguably is; *Bottone, supra,* therefore is not relevant.

*Id.* at 921–22.

Although Lang's conduct in this case was despicable, this court has no power to rewrite § 2071 in the way advocated by the government. *See United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) ("[B]ecause of the seri-

---

not be deprived of the document's value so long as the information remains in its files.
  . . . .
  In contrast, the only purpose of filing the sealed affidavit in this case was to allow the government to secretly place a tracking device on the vehicle used by the Perez Organization.... Ms. Lang's removal of that document "interfere[d] with the lawful use

of the record" by preventing the government from secretly installing the tracking device. Therefore, unlike the removal of the copies in *Martin* and *Rosner,* Ms. Lang's removal of the copy wholly destroyed the legal effect and usefulness of the sealed affidavit.

Govt. Br. at 38–40 (citations omitted).

ousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies the instinctive distastes against men languishing in prison unless the lawmaker has clearly said they should." (quotation omitted)). Make no mistake, the government has asked this court to rewrite § 2071(a) so that it reads as follows:

> Whoever willfully and unlawfully conceals, removes, mutilates, obliterates, or destroys, or attempts to do so, or with intent to do so takes and carries away any record, proceeding, map, book, paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States, or in any public office, or with any judicial or public officer of the United States[, or discloses the contents of any such document thereby constructively destroying the usefulness of the document to the government], shall be fined under this title or imprisoned not more than three years, or both.

It is important to note that under the government's reconstructed version of § 2071(a), no photocopying is necessary. The same result would have logically applied had Lang simply memorized the contents of the affidavit and disclosed the contents to her husband upon arriving home that evening. In such a hypothetical case, as in this one, the usefulness of the affidavit would have been "constructively destroyed." Such a result is so far removed from the plain language of § 2071(a) and in such disregard of the Supreme Court's admonition that criminal statutes be construed narrowly, *Bass,* 404 U.S. at 347–48, 92 S.Ct. 515, that the government's proposed interpretation of § 2071 must be rejected.

In sum, neither the majority's nor the government's reading of § 2071 is consistent with that provision's plain language or legislative history. It is telling that in the long history of § 2071, there does not appear to be a single reported case in which that statute was successfully employed to prosecute conduct like that at issue in this case. For these reasons, and because the majority's approach amounts to at least a partial merger of §§ 2071 and 641, I respectfully dissent from the majority's conclusion that Lang's conduct falls within the ambit of § 2071.

## B. Calculation of Lang's Base Offense Level

The majority concludes that the district court properly calculated Lang's base offense level by reference to all drugs distributed by the Perez Organization, whether or not Lang knew or should have reasonably known of the drug quantities. *See* Majority Op. at 1219–21. In so doing, the majority adopts the minority approach, represented by the Seventh Circuit's opinion in *United States v. Girardi,* 62 F.3d 943 (7th Cir.1995), and rejects the better-reasoned majority approach, represented by the Fifth Circuit's opinion in *United States v. Warters,* 885 F.2d 1266 (5th Cir.1989) and the Sixth Circuit's opinion in *United States v. Shabazz,* 263 F.3d 603 (6th Cir.2001). Unfortunately, the approach adopted by the majority creates a system where accessories can be punished much more harshly than the principal whom they aided and, more importantly, renders U.S.S.G. § 1B1.3 application note 10 superfluous.

As noted by the majority, the resolution of this case is driven by the meaning of two different provisions of the Sentencing Guidelines. Application note 1 to U.S.S.G. § 2X3.1 provides that in calculating a defendant's base offense level the court should "[a]pply the base offense level [for the underlying offense] plus any applicable specific offense characteristics that were

known, or reasonably should have been known, by the defendant; *see* Application Note 10 of the Commentary to § 1B1.3 (Relevant Conduct)." Application note 10 to U.S.S.G. § 1B1.3 provides, in turn, that "[i]n the case of ... accessory after the fact, the conduct for which the defendant is accountable includes all conduct relevant to determining the offense level for the underlying offense that was known, or reasonable should have been known, by the defendant." According to the majority, these two provisions appear to be contradictory when read in isolation. *See* Majority Op. at 1220 ("Thus, § 2X3.1, applied in isolation, would only extend the reasonable-knowledge requirement to 'specific offense characteristics' of the underlying offense."); *id.* ("Therefore reading Application Note 10 in isolation would extend the reasonable-knowledge requirement to all conduct used to determine the sentence for the underlying offense, not only specific offense characteristics."). Finding an apparent contradiction, the majority resolves the "prima facie tension" between the two provisions by concluding that the term "includes" in application note 10 to § 1B1.3 is not exhaustive and that application note 1 to § 2X3.1 merely sets forth an additional type of relevant conduct, i.e., conduct not reasonably foreseeable to the accessory, which must be included in calculating the accessory's base offense level. *Id.* at 1220–21; *see also Girardi*, 62 F.3d at 946.

Like the Fifth and Sixth Circuits, I see no conflict between the two application notes at issue here. By cross-referencing application note 10 to § 1B1.3, it appears the Sentencing Commission was specifically noting that the rule set out in application note 1 to § 2X3.1 is entirely consistent with the rule set out in § 1B1.3. *See Shabazz*, 263 F.3d at 608–09; *Warters*, 885 F.2d at 1272–73. Otherwise, "it is difficult to see why Application Note 1 to section 2X3.1 cross-references section 1B1.3." *Shabazz*, 263 F.3d at 609.

The majority's reading of the relevant Guideline provisions posits something like the following course of action on the part of the Sentencing Commission. The Sentencing Commission intended to set out an application note directing that all aspects of an accessory's offense level—base offense level, specific offense characteristics, Chapter Two cross-references, and Chapter Three adjustments—be calculated with reference to that conduct within the underlying offense of which the accessory should have reasonably been aware. U.S.S.G. § 1B1.3 cmt. n. 10. The Sentencing Commission then set forth a different provision (1) mandating that the accessory's base offense level would actually include conduct within the underlying offense of which the accessory was not aware, (2) reiterating that specific offense characteristics would only be included in the accessory's total offense level if the accessory should reasonably have been aware of the conduct giving rise to such an adjustment, and (3) failing to further comment on how Chapter Two cross-references and Chapter Three adjustments would apply to the calculation of an accessory's total offense level. U.S.S.G. § 2X3.1 cmt. n. 1. Further, the Sentencing Commission altered course without any explanation, but instead simply included a naked cross-reference to the earlier, partially-repudiated application note. To say the least, I find such a course of action highly unlikely. Instead, it seems apparent that the Sentencing Commission simply attempted to incorporate the standards set out in U.S.S.G. § 1B1.3 application note 10 into U.S.S.G. § 2X3.1 application note 1 and did so in a somewhat sloppy fashion. *See Shabazz*, 263 F.3d at 608 (noting that the Guideline provisions at issue here are "hardly a model of clarity").

This conclusion is bolstered by a consideration of the repercussions inherent in the approach adopted by the majority. Under the majority's approach, an accessory can face a far stiffer punishment than the principal whom the accessory aids. For instance, assume a young women becomes involved in a massive drug conspiracy. The young woman's involvement in the drug conspiracy is exceedingly limited, as is the extent of her reasonable knowledge of the scope of the conspiracy. When the government begins to prosecute the members of the conspiracy, the young woman approaches her father, explains the limited nature of her actions and her understanding of the scope of the conspiracy, and asks for his assistance. The father provides the woman with money for a bus ticket to another state, hoping that the young woman can avoid capture by the authorities. When the young woman is eventually arrested, both she and her father are prosecuted.

As a principal, all aspects of the young woman's offense level are calculated by reference to her own acts and "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(A) & (B). The situation for the father is entirely different, however. Under the majority's approach the base-offense-level component of the father's total offense level is calculated with regard to the entire amount of drugs distributed by the underlying conspiracy, thereby potentially resulting in a sentence far more severe then that imposed on the young woman. Such a result is at odds with the very theory of criminalizing the acts of accessories. *See Shabazz*, 263 F.3d at 609–10. Without a clear indication on the part of the Sentencing Commission that such a result is required, I simply cannot adopt the reading of U.S.S.G. § 2X3.1 application note 1 set forth in the majority opinion. In sum, I agree with the Fifth and Sixth Circuits

that U.S.S.G. § 2X3.1 clearly incorporates U.S.S.G. § 1B1.3.

In the alternative, the disparate interpretations given to the relevant provisions, all under the banner of plain language, by *Girardi* and the majority, on one hand, and *Warters, Shabazz,* and this dissent, on the other hand, demonstrate that this is an appropriate case for application of the rule of lenity. Because the utterly ambiguous language of these two application notes simply cannot resolve this sentencing dispute, the rule of lenity counsels in favor of adopting the construction of the Guidelines advanced by Lang. *United States v. Wilson*, 10 F.3d 734, 736 (10th Cir.1993).

Because I disagree with the majority both as to the plain meaning of the relevant provisions and as to the applicability of the rule of lenity to this case, I respectfully dissent.

### III. CONCLUSION

For those reasons set out above, I would affirm the district court in all respects except for its treatment of Lang's § 2071 conviction and its calculation of her base offense level. As to the § 2071 charge, I would remand to the district court for the narrow purpose of vacating the § 2071(a) conviction, sentence, and special assessment. As to the Lang's base offense level, I would remand to the district court with directions to recalculate Lang's offense level only by reference to the conduct of the Perez Organization of which she was aware or reasonably should have been aware.